## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| **TERRY P. HELLER** | : **CIVIL ACTION** |
|---|---|
| | : |
| **v.** | : **NO. 25-5550** |
| | : |
| **BROOKHAVEN BOROUGH,** | : |
| **MICHAEL L. VICE** | : |

## **MEMORANDUM**

**KEARNEY, J.**                                                                                    **February 11, 2026**

We today address whether a police chief directing his officers' search of a license plate reader system to find his borough's council president after 11 p.m. without reasonable suspicion, eventual arrest, and later press release justifying his conduct after the prosecutors dismiss the charges violates the borough council president's rights. We find the council president pleaded a basis for an unconstitutional search claim against the police chief and borough and unconstitutional seizure claim against the police chief. We dismiss his other claims.

A borough council president voted against a pay raise for a borough police officer. The borough's police chief directed his officers four nights later to search the police department's license plate reader system to find the borough council president in the borough and then go watch his activities. Two officers (including one denied a pay raise) found the council president's location through the license plate reader system, drove over to the site, watched him drive away from a restaurant after 11 p.m., and stopped him based on a perceived traffic violation. The council president passed a preliminary breath test. The police chief directed the officers to take the council president to a hospital for a blood test. The county prosecutors dropped charges after the blood tests confirmed the council president did not drive under the

influence of alcohol under Pennsylvania law. The police chief then issued a press release on Facebook justifying his borough officers' conduct.

And now this dispute between two formerly powerful men in a small town comes before us through the council president's claims against the former police chief and the borough he once lead. He may proceed on his unconstitutional search claims against the police chief and borough and his unconstitutional seizure claim against the police chief. We grant him leave to plead facts which may allow us to plausibly infer a basis for other claims not dismissed with prejudice.

## I.    Alleged facts and public record.

Brookhaven Borough residents elect fellow residents to serve on Borough Council and thoughtfully manage the Borough's affairs including how much to pay police officers and review the conduct of the Borough Police Department. Resident Terry Heller, as a private citizen at an unpleaded time, investigated and communicated with other Brookhaven residents regarding reports against Brookhaven Police Chief Michael L. Vice and the Borough Police Department "of significantly increased rates of DUI arrests and towed vehicles" along with reports of prosectors and courts dismissing the Police's driving under the influence cases at unpleaded times.[1] Resident Heller then served on the Borough Council for several years before 2024, including as Council President in at least early 2020.[2]

### *Borough Council knew its police used VIPR in 2023 to watch an injured officer.*

The Brookhaven Borough Police Department uses software technology and maintains public cameras known as "VIPR" to automatically read license plates on cars travelling in the Borough.[3] License plate reader systems "combine high-speed cameras and sophisticated software to capture and convert license plate images into data that can be compared with information in other databases."[4] "Cameras often are placed 'in fixed locations'" and "'automatically and

2

without direct human control locate, focus on, and photograph license plates and vehicles that come within range of the device.'"[5] Other license plate reader systems rely on mobile cameras attached to police vehicles, tow trucks, and vehicles operated by repossession companies.[6] License plate readers "then convert the license plate number into a computer-readable format, uploading the number, an image of the license plate, and the date and time the photograph was taken into a searchable database."[7]

The VIPR system used by the Borough promotes itself as offering "real-time vehicle locations, historical leads, and information with neighboring departments with VIPR's mobile, stationary, and in-app [license plate reader] solutions."[8] It "generates real-time and historical data about the movement of vehicles . . . based on make, model, color, and superior license plate recognition."[9] VIPR "enable[s] proactive policing with vehicle intelligence and automatic license plate recognition (ALPR) technology that's always-on, always-accessible, and forever-accurate" and its "vehicle intelligence models updates in minutes."[10] "Identifying the movement of wanted vehicles is, and will continue to be, the exclusive focus for VIPR."[11] VIPR's stated goal is to "make stories that start with 'Today, I used VIPR to solve…' become an everyday occurrence in U.S law enforcement."[12]

Chief Vice used the VIPR system in December 2023 to locate and surveil fellow Officer Brent Roller while Officer Roller remained off duty due to injury.[13] Another Brookhaven officer assisted Chief Vice in accessing VIPR on multiple occasions during the same period to determine Officer Roller's movements, including when he visited a local gym while out of work due to injury.[14] The Borough and its Council knew the Police Department used VIPR to watch Officer Roller.[15] The Borough and its Council did not stop Chief Vice from using VIPR to

3

surveil his own officers nor did it develop or implement written policies, procedures, or training governing the use of VIPR.[16]

### *Council President Heller opposed a pay raise for an officer in March 2024.*

Borough Council President Terry Heller voted against a proposed pay increase for Officer Orabi Youssef on March 4, 2024.[17]

### *Chief Vice directs officers to search the VIPR for the location of Council President Heller's license plate four evenings after voting against the pay raise.*

Four nights later, Chief Vice directed Officer Joseph Pastuszek to access the VIPR and search Council President Heller's license plate number at approximately 11:14 p.m. on March 8, 2024.[18] Officer Youssef (having been denied a pay raise four days earlier) accessed VIPR at approximately 11:24 p.m., again at Chief Vice's direction, and conducted a second search of Council President Heller's license plate number.[19] Officers Pastuszek and Youssef used VIPR data to identify the most-recent location of Council President Heller's license plate based on cameras around the Borough.[20]

Officers Pastuszek and Youssef traveled to a restaurant area near 4750 Edgemont Avenue and observed Council President Heller's car in the area as earlier shown on the VIPR search for the location of his license plate.[21]

### *Police stop and detain Council President Heller.*

Officer Youssef stopped Council President Heller's car near 4900 Edgemont Avenue at approximately 11:49 p.m.[22] Council President Heller did not violate a traffic regulation before the stop.[23] The officers detained Council President Heller during the stop and conducted a DUI

investigation.[24] Officers Pastuszek and Youssef communicated electronically with Chief Vice from the scene.[25] Chief Vice directed further investigation and arrest-related decisions.[26]

The officers' preliminary breath test produced a result of 0.059 (below the legal limit for a DUI charge in Pennsylvania).[27] The officers searched Council President Heller and his car, seized Council President Heller's firearm, and transported Council President Heller to a hospital for a blood draw.[28] The hospital's testing also confirmed a blood alcohol level below the legal limit.[29]

The District Attorney declined to file DUI charges against Council President Heller because the blood results did not support the charge.[30]

### *Chief Vice issued a press release after prosecutors dropped the charges.*

Chief Vice issued a press release eighteen days later describing Council President Heller's traffic stop.[31] He published the press release on the Police Department's Facebook page.[32] Chief Vice told the public his officers conducted a traffic stop for "traffic violations," "detected the odor of an alcoholic beverage on the vehicle operator's breath and person," "determined [Council President] Heller did not satisfactorily complete the tests," and police "subsequently arrested [Council President Heller] for the suspicion of DUI."[33] Chief Vice reported he "received the findings of the Delaware County Criminal Investigation Division" earlier in the day, "probable cause existed for the arrest for suspicion of Driving Under the Influence," and "the blood analysis results came back slightly under the legal limit," after which "the investigation has been closed by the Delaware County Criminal Investigation Division" and Council President Heller "will not be charged criminally with DUI."[34] Chief Vice "fully support[ed] the traffic stop and the proper actions that were taken by [the] Officer," describing the officer's actions as "appropriate" and "within the guidelines of departmental policy."[35]

### *Borough places Chief Vice on leave.*

The Borough placed Chief Vice on administrative leave on April 18, 2024 and directed him to surrender his weapon, badge, and Borough-issued mobile phone.[36] Chief Vice restored the Borough-issued mobile phone to factory settings before surrender.[37] Chief Vice resigned on September 9, 2024.[38]

### *Council President Heller sues Chief Vice and the Borough.*

Council President Heller sued the Borough and Chief Vice for damages in late September 2025 during his campaign for Borough Mayor.[39] He asserted claims for First Amendment retaliation, unlawful search and seizure under the Fourth Amendment, violations of the Fourteenth Amendment, and a defamation-based stigma-plus claim.[40] He further alleged the Borough and Chief Vice conspired to deprive him of his First, Fourth, and Fourteenth Amendment rights in retaliation for his vote as Borough President and his citizen activity and separately based on a class-based discriminatory animus.[41] Council President Heller seeks to impose municipal liability upon the Borough.[42]

The Borough residents elected someone other than Council President Heller as Borough Mayor in November 2025. Council President Heller amended his allegations after losing the mayor race.[43]

## II. Analysis

Chief Vice moved to dismiss the amended Complaint arguing Council President Heller did not plead his personal involvement, reasonable suspicion supported the Fourth Amendment seizure based on facts outside the pleadings, and Council President Heller did not plead First Amendment retaliation, Fourteenth Amendment equal protection, defamation-based stigma-plus,

6

or conspiracy claims.[44] He further argues the sections 1985 and 1986 claims fail for lack of class-based animus and the official capacity claims are duplicative of claims against the Borough.[45]

The Borough separately moved to dismiss. It argues Council President Heller alleges no official policy, custom, or decision by its Council causing the alleged constitutional violations, supervisory liability is unavailable under the civil rights law, and all derivative conspiracy and constitutional claims fail absent a viable underlying violation attributable to a Borough policy or custom.[46]

We grant Chief Vice's Motion and the Borough's Motion in part. Council President Heller may move into discovery on his Fourth Amendment unreasonable search and unreasonable seizure claims and his section 1983 conspiracy claim against Chief Vice. And he may proceed against the Borough on the Fourth Amendment unreasonable search claim.

We dismiss with prejudice Council President Heller's official capacity claims and his sections 1985(3) and 1986 claims as he cannot state those claims as a matter of law. We dismiss without prejudice Council President Heller's First Amendment, Fourteenth Amendment Equal Protection, and defamation claims against Chief Vice and the Borough, as well as his Fourth Amendment unreasonable seizure and section 1983 conspiracy claims against the Borough, with leave to file a timely second amended complaint. We deny Chief Vice's Motion as to Council President Heller's Fourth Amendment unreasonable search claim against the Borough and Chief Vice based on the queries/searches of VIPR and his Fourth Amendment unreasonable seizure claim and section 1983 conspiracy claim against Chief Vice.

## A. We dismiss all official capacity claims against Chief Vice with prejudice.

Council President Heller sues Chief Vice in both his individual and official capacities. Chief Vice argues we must dismiss the official capacity claims against him.[47] Council President

7

Heller counters we should not dismiss the claim at the motion to dismiss stage and instead allow for competition of discovery.[48] We agree with Chief Vice.

We treat civil rights claims against county or municipal officials in their official capacity as claims against the entity itself.[49] The official capacity claims against Chief Vice are treated as claims against the Brookhaven Police Department. But the Brookhaven Police Department is a sub-unit of the municipality and may not itself be sued as a "person" acting under color of state law.[50]

We dismiss all official capacity claims against Chief Vice with prejudice.

### B. Council President Heller may proceed on a Fourth Amendment search claim based on searching the VIPR system.

Council President Heller alleges Chief Vice and the Borough violated his Fourth Amendment right to be free from unreasonable searches and seizures by conducting both an unconstitutional search and an unconstitutional seizure.[51]

We first address the alleged unconstitutional search through a query of VIPR looking for Council President Heller. Council President Heller argues Chief Vice and the Borough engaged in "unconstitutional *de facto* policies, practices, and/or customs" by using a "law-enforcement-only VIPR technology" to query his license plate number and identify his location.[52] He alleges Officers Pastuszek and Youssef accessed VIPR twice on the evening of March 8, 2024 at Chief Vice's direction, used the system to obtain his car's location, and then, with the information, located and surveilled him before initiating a traffic stop approximately twenty-five minutes later.[53] He further alleges the Borough "demonstrated a pattern of deliberate indifference to foreseeable constitutional violations arising from known unauthorized use of VIPR by knowingly refusing to control the unconstitutional conduct of [Chief] Vice and the Police Department."[54]

Chief Vice argues he cannot be held liable for an alleged Fourth Amendment violation because he did not "physically participate" in the search.[55] He contends Council President Heller alleges only "other officers assessed the VIPR system and ordered the investigation and arrest at [Chief Vice's] direction via an electronic communication device" but does not allege Chief Vice presence "at the scene."[56] Chief Vice argues Council President Heller cannot plead his personal involvement necessary for individual liability under section 1983.[57] The Borough argues it cannot be held liable under the *Monell* theory of municipal liability because its Council took no official action authorizing the use of VIPR.[58]

We must first distinguish two functions of the VIPR system: (1) the Borough's installation and general operation of a license plate reader system through public cameras collecting data on all vehicles traveling on public roads, and (2) officers' targeted access to and querying of the VIPR database to locate a specific individual by identifying his whereabouts through his license plate. These distinct acts raise different Fourth Amendment questions and must be analyzed separately.

We look to the common law of trespass when examining Fourth Amendment searches.[59] The Supreme Court recognizes "property rights are not the sole measure of Fourth Amendment violations."[60] The Court instructs "the Fourth Amendment protects people, not places."[61] We "expanded our conception of the Amendment to protect certain expectations of privacy as well."[62] We may find a reasonable expectation of privacy when Council President Heller shows: (1) he exhibited an actual, subjective expectation of privacy and (2) society is prepared to recognize his expectation as reasonable.[63]

The expanded use of electronic tracking tools by law enforcement requires us to determine when the Fourth Amendment applies. The Supreme Court almost fourteen years ago

9

held in *United States v. Jones* attaching a GPS tracker to an individual's vehicle constituted a Fourth Amendment search.[64] But the Court stopped short of finding the general use of electronic tools to conduct long-term traditional surveillance constituted an unconstitutional invasion of privacy.[65]

The Supreme Court revisited the digital surveillance privacy question eight years ago in *United States v. Carpenter* when police used historical cell site location information to track an individual's movements.[66] The Court expressed concern the cellphone data at issue allowed the police to achieve "near perfect surveillance" and could "now travel back in time to retrace a person's whereabouts."[67] The Court found "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through [cell site location information]."[68] The police conducted a Fourth Amendment search when it acquired historical cell site location information.[69] The Court did not address whether the collection of real-time cell site location information violated a similar expectation of privacy.[70]

### 1. Maintaining the pleaded VIPR technology is not an unreasonable search.

We find the Borough's license plate reader through cameras is not violative of the Fourth Amendment under the pleaded facts. We are guided by colleagues applying the Supreme Court's instructions in *Jones* and *Carpenter* to license plate reader systems. Many have found maintaining a license plate reader system is not a Fourth Amendment search because individuals do not possess an expectation of privacy in their license plates or license plate numbers and the use of license plate reader systems to locate a vehicle does not involve the same level of secret monitoring and movement cataloguing contained in cell site location information.[71]

Our colleagues remain concerned with the surveillance capabilities of license plate reader systems when deployed broadly. "If deployed widely enough, [automatic license plate readers]

could tell police someone's precise, real-time location virtually any time the person decided to drive, thus making [automatic license plate readers] the vehicular equivalent of a cellular telephone 'ping.'"[72] And "like carrying a cellular telephone, driving is an indispensable part of modern life, one we cannot and do not expect residents to forgo in order to avoid government surveillance."[73] License plate reader systems "collect information without individualized suspicion, and records can be maintained for years" and "[i]n retrospective searches, detailed and potentially private information may be exposed."[74] These concerns mirror those identified by the Supreme Court in *Carpenter*. "[T]he retrospective quality of the data here gives police access to a category of information otherwise unknowable."[75] "In the past, attempts to reconstruct a person's movements were limited by a dearth of records and the frailties of recollection . . . this newfound tracking capacity runs against everyone."[76] "[P]olice need not even know in advance whether they want to follow a particular individual, or when."[77]

We follow this robust consensus and find the Borough's installation and general operation of the VIPR system does not, by itself, constitute a Fourth Amendment search under the pleaded facts. Our conclusion based on the present allegations of the use of the cameras in the Borough relates only to VIPR's passive operation and data collection. It does not resolve whether officers may access the VIPR database to locate a person absent reasonable, articulable suspicion.

### 2. Querying/searching the VIPR for the Council President location without reasonable articulable suspicion may violate the Fourth Amendment.

But Council President Heller sufficiently pleads Chief Vice directed the search (query) of the VIPR database to locate him without a reasonable articulable suspicion of criminal conduct afoot necessary for this targeted database search. He also sufficiently alleges the Borough, through its Council, knew Chief Vice previously accessed and searched VIPR for similar

purposes, including to find allegedly injured Officer Roller going to a gym a few months earlier. We cannot guess as to Chief Vice's reasonable suspicion of a crime at the time he directed these searches (queries) on the VIPR system which we expect to learn through discovery and potentially trial.

A different constitutional question arises when officers use a license plate reader database to *generate* reasonable suspicion.[78] The Supreme Court instructs we "usually require[] 'some quantum of individualized suspicion' before a search or seizure may take place."[79] Our colleagues caution license plate reader technology may involve Fourth Amendment protections depending on how officers access and use the data. "Undeniably, the use of automatic license[ ] plate readers to generate a pretext for stopping drivers is something which is not new."[80] Where "an officer uses the [automatic license plate reader] database to generate the facts necessary to constitute reasonable suspicion, the database may elicit information providing a far more elaborate picture of travel in which the car-owner had a reasonable expectation of privacy."[81]

Our colleagues have generally found no Fourth Amendment search when the officers can demonstrate a reasonable articulable suspicion *before* searching the database.[82] The officers in those cases accessed the license plate reader database in the context of an existing investigation or with some articulable basis for locating a particular vehicle.[83] As a result, the courts did not confront whether officers may use a license plate reader database to *create* reasonable suspicion in the first instance, rather than to confirm or corroborate suspicion already held.[84]

Council President Heller alleges Chief Vice directed officers to access the VIPR database without reasonable suspicion to find him by locating his car. He alleges Officers Pastuszek and Youssef queried VIPR at Chief Vice's direction and used the database results to find and surveil him before initiating the traffic stop. Accepting these allegations as true, Chief Vice and Officers

Pastuszek and Youssef did not merely consult VIPR to confirm a reasonable suspicion. They allegedly used VIPR to locate Council President Heller by identifying his movements in real time and then initiating the stop. We cannot determine at this stage whether the scope and manner of these VIPR searches constituted a reasonable search under the Fourth Amendment. His allegations allow us to plausibly infer Fourth Amendment concerns.

Council President Heller also plausibly alleges a basis for municipal liability against the Borough for the VIPR database searches under a custom and deliberate indifference theory.[85] He alleges the Borough, through its Council, knew Chief Vice had previously accessed and searched VIPR for unauthorized purposes and took no corrective action, imposed no guardrails, and adopted no training or supervisory measures to prevent future misuse of VIPR.[86]

A municipality may be held liable under federal civil rights law only when its official policy or customs caused the alleged constitutional violation.[87] Council President Heller must "specify what exactly that custom or policy was."[88] A custom enacted by the Borough may lead to liability if it is "so widespread as to have the force of law."[89] "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy."[90] Council President Heller may establish the existence of the unconstitutional custom or policy by alleging the Borough acquiesced to the specific unlawful conduct or by alleging the Borough's deliberate indifference to the purported constitutional deprivation.[91] Council President Heller can plead liability under an acquiescence or deliberate indifference theory only if he alleges a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation' to ground municipal liability."[92] One way of proving causation is to show "policymakers were

aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury."[93]

Accepting his allegations as true, Council President Heller plausibly pleads a widespread practice amounting to a municipal custom. He alleges similar misuse of VIPR four months earlier, knowledge by Borough decisionmakers, and continued inaction. He also pleads a sufficient causal connection by alleging Borough's failure to supervise, regulate, or restrict access to VIPR enabled Chief Vice to direct officers to query the database to locate him. These allegations plausibly support the Borough's inaction served as a moving force behind the challenged searches at this stage.

Council President Heller may proceed on his Fourth Amendment unreasonable search claim against Chief Vice and the Borough to the extent he challenges Chief Vice's direction to access and search the VIPR database with no reasonable, articulable suspicion of criminal conduct afoot.

### C. Council President Heller pleads a Fourth Amendment unreasonable seizure claim and section 1983 conspiracy claim against Chief Vice.

Council President Heller alleges Chief Vice violated his Fourth Amendment rights "by initiating a traffic stop without probable cause or reasonable suspicion."[94] Chief Vice first argues the officers conducted a reasonable traffic stop and then argues he is not liable for the officers' conduct because he had no personal involvement in the traffic stop.[95] Council President Heller counters by alleging Officer Youssef did not witness a traffic violation and initiated the stop under the direction of Chief Vice.[96] Council President Heller argues these facts allow us to plausibly infer Officer Youssef initiated an unreasonable traffic stop and establish Chief Vice's involvement even without his physical presence.[97] We find Council President Heller pleads a plausible claim for unreasonable seizure against Chief Vice.

14

A traffic stop for a suspected violation of law is a "seizure" of the vehicle's occupants and must be conducted in accord with the Fourth Amendment.[98] Police officers may conduct brief investigatory stops if they have a "reasonable, articulable suspicion that criminal activity is afoot."[99] Our Court of Appeals expressly adopts "reasonable suspicion" as the applicable standard when examining the lawfulness of a traffic stop.[100]

Chief Vice argues Officer Youssef had reasonable suspicion to initiate the March 8, 2024 traffic stop because Officer Youssef saw Council President Heller make a sudden left turn through a steady red light.[101] Council President Heller alleges he did not drive through a red light nor violate traffic laws.[102] Council President Heller further claims the police completed a pretextual stop and "transported him to a hospital for a blood draw without probable cause."[103]

We accept the facts as alleged by Council President Heller as true and construe them in the light most favorable to him. Council President Heller alleges Officer Youssef executed a pretextual stop with no reasonable suspicion, which supports a plausible inference Officer Youssef subjected Council President Heller to an unreasonable seizure.

Council President Heller must allege personal involvement by Chief Vice to state an unreasonable seizure claim against Chief Vice in his individual capacity.[104] He alleges Chief Vice personally involved himself in the traffic stop by communicating and conspiring with Officers Youssef and Pastuszek before and during the traffic stop. Chief Vice argues he had no physical presence at the stop and did not order an investigation until after the arrest.[105] We again accept as true the facts as alleged by Council President Heller.

"Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity."[106] In this context, our

15

Court of Appeals instructs "a civil rights complaint is adequate where it states the conduct, time, place, and persons responsible."[107]

Council President Heller alleges Chief Vice's personal involvement in the traffic stop with appropriate particularity. He alleges Chief Vice communicated and conspired with Officers Pastuszek and Youssef to target Council President Heller and generate a traffic stop.[108] He also alleges "Officers Pastuszek and Youssef communicated via electronic communication device with [Chief] Vice from the scene of [Council President Heller's] arrest and [Chief] Vice ordered the investigation, arrest and prosecution of [Council President Heller]."[109] These allegations are sufficient to allow us to infer Chief Vice's role in the conduct, time, and place of the seizure and allow us to plausibly infer Chief Vice's personal involvement in the unreasonable seizure.

The facts supporting the unreasonable seizure claim are sufficient to support Council President Heller's section 1983 conspiracy claim against Chief Vice.[110]

### D. We dismiss all remaining claims against Chief Vice.

Council President Heller does not properly plead his First Amendment retaliation claim, his Fourteenth Amendment equal protection claim, or his defamation stigma-plus claim. We dismiss these claims without prejudice because Council President Heller does not allege sufficient facts allowing us to plausibly infer a basis for each claim. We dismiss his section 1985(3) conspiracy claim and section 1986 claim with prejudice because Council President Heller cannot state a claim under section 1985(3), under which Congress requires he plead race or class-based animus.

#### 1. We dismiss the First Amendment retaliation claim against Chief Vice.

Council President Heller alleges Chief Vice retaliated against him for two types of protected First Amendment conduct. Council President Heller alleges he engaged in protected

conduct when he voted as Council President against a pay increase for Officer Youssef.[111] Chief Vice argues Council President Heller does not have a personal right in the votes he makes as a member of the Borough's Council.[112] We agree with Chief Vice. Council President Heller's vote as a municipal legislator is not protected conduct.[113] He has no personal right in his votes as a municipal legislator. Council President Heller cannot engage in constitutionally protected conduct when he has no personal right to the conduct. Council President Heller does not plead a claim for retaliation based on his votes cast as a municipal legislator.

Council President Heller alleges he also engaged in constitutionally protected conduct as a private citizen at an unpleaded time. He alleges he "investigat[ed] and communicat[ed] with others [sic] Brookhaven residents regarding reports . . . of significantly increased rates of DUI arrests and towed vehicles" "as a citizen of Brookhaven[.]"[114] Chief Vice responds no facts satisfy the causation requirement for Council President Heller's protected activity investigating the Borough's Police Department.[115] We agree with Chief Vice as to causation relating to comments made at some unpleaded time.

Council President Heller can allege causation by pleading facts showing (1) "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."[116] He "'must establish the [protected] activities were substantial and motivating factors' in the allegedly retaliatory conduct."[117] Our Court of Appeals instructs we "must be diligent" in enforcing the causation requirement to ensure state actors are not "chilled from taking action that he deemed appropriate and, in fact, was appropriate."[118]

Council President Heller does not allege facts supporting either path to causation. Council President Heller only alleges he made his investigatory statements in his "then-recent

role" as a private citizen. Calling his role "then-recent" does not establish unusually suggestive temporality. Council President Heller also alleges no facts establishing a pattern of antagonism by Chief Vice. Council President Heller cannot advance his retaliation claim without plausibly alleging causation.

We dismiss the First Amendment retaliation claim against Chief Vice without prejudice.

### 2. We dismiss the Fourteenth Amendment equal protection claim against Chief Vice.

Council President Heller claims Chief Vice deprived him of equal protection under the Fourteenth Amendment based on his status as Borough Council President.[119] He also asserts "as a resident and motorist of Brookhaven, [he] was treated differently from other similarly situated individuals."[120] Chief Vice counters Council President Heller pleads no facts identifying any similarly situated individual.[121] We agree with Chief Vice.

A viable Fourteenth Amendment equal protection claim requires pleading either class-based discrimination or a "class-of-one" claim.[122] A class-based discrimination claim requires Council President Heller allege "he was treated differently than other similarly situated [individuals], and that this different treatment was the result of intentional discrimination based on his membership in a protected class."[123] A "class-of-one" claim requires Council President Heller allege "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment."[124]

Council President Heller did not allege he is a member of a protected class. He instead attempts to proceed under a "class-of-one" theory. The requirement to allege different treatment relative to similarly situated individuals imposes a low burden at the pleadings stage.[125] Council President Heller "need not 'name names' or identify 'specific instances where others have been

treated differently.'"[126] But he "must allege facts sufficient to make plausible the existence of . . . similarly situated parties."[127] "Persons are similarly situated . . . when they are alike in all relevant aspects."[128] "Failure to identify similarly situated persons dooms an equal-protection claim."[129]

Council President Heller pleads nothing more than conclusory assertions. He does not allege the existence of similarly situated Borough Council Presidents whom Chief Vice treated differently. Nor does he allege, "as a resident and motorist of [the] Borough," similarly situated residents or motorists who engaged in comparable conduct during traffic stops yet received different treatment. "Without more specific factual allegations as to the allegedly similarly situated parties, he has not made plausible the conclusion that those parties exist and that they are like him in all relevant aspects."[130] His assertions "consist[] of nothing more than 'labels and conclusions,' rather than specific, factual allegations."[131] Council President Heller "fails to identify a comparator who engaged in comparable misconduct but was treated more favorably, and thus fails to plead the essential elements of a viable comparator-based or class-of-one equal protection claim."[132]

We dismiss Council President Heller's Fourteenth Amendment equal protection claim against Chief Vice.

### 3. We dismiss the defamation claim against Chief Vice.

Council President Heller alleges Chief Vice defamed him by making false statements in a press release published on Facebook.[133] Council President Heller alleges these statements damaged his reputation, political career, and standing in the community and caused emotional distress and other injuries.[134] Chief Vice counters he made no false statements and his statements

did not cause Council President Heller to suffer a deprivation of a non-reputational right or interest.[135] We agree with Chief Vice.

Council President Heller does not adequately plead a stigma-plus claim because he does not allege a deprivation of a non-reputational right or interest—the required "plus" element. A civil rights claim for reputational harm requires Council President Heller "show a stigma to his reputation *plus* deprivation of some additional right or interest."[136] "[R]eputation damage is not actionable unless 'it occurs in the course of or is accompanied by a change or extinguishment of a right or status guaranteed by state law or the Constitution.'"[137] "[T]he 'stigma-plus' test requires that the defamation be accompanied by an injury directly caused by the Government, rather than an injury caused by the act of some third party."[138]

We do not need to consider the "stigma" or defamation portion of Council President Heller's stigma-plus claim because he does not allege the required "plus" element. Council President Heller claims he suffered four potential types of non-reputational injury. But he offers only conclusory statements for the first three: "emotional distress, . . . invasion of privacy, and other injuries."[139] He does not specify how he suffered each injury, nor does he plead how Chief Vice directly caused them.

Council President Heller alleges a fourth potential "plus" injury: Chief Vice's statements caused him to lose the November 2025 election for Borough Mayor.[140] The mayoral election occurred eighteen months after Chief Vice's statements and Facebook posts. Council President Heller alleges no facts permitting a plausible inference Chief Vice's statements "caused" citizens to vote against him. Council President Heller also does not allege how the intervening conduct of voting citizens did not break the causation chain of Chief Vice's statement.

We cannot plausibly infer Chief Vice caused Council President Heller's election loss absent additional facts. We dismiss Council President Heller's defamation stigma-plus claim against Chief Vice without prejudice.

### 4. We dismiss the section 1985(3) conspiracy and section 1986 claims against Chief Vice with prejudice.

Council President Heller alleges Chief Vice participated in a conspiracy in violation of section 1985(3) to deprive him of constitutional rights.[141] He further alleges Chief Vice violated section 1986 by failing to stop the alleged section 1985(3) conspiracy despite having the power to do so.[142] Chief Vice counters Council President does not plead a section 1985(3) conspiracy claim because he does not allege race- or class-based invidious discrimination and the section 1986 claim necessarily fails absent a viable section 1985(3) claim.[143] We agree.

"[B]ecause [section] 1985(3) requires the 'intent to deprive of *equal* protection, or *equal* privileges and immunities,' a claimant must allege 'some racial, *or perhaps otherwise class-based*, invidiously discriminatory animus behind the conspirators' action' in order to state a claim."[144] "In cases that do not involve racial discrimination, . . . a 'plaintiff must allege both that the conspiracy was motivated by discriminatory animus against an identifiable class and that the discrimination against the identifiable class was invidious.'"[145] "Generally, discrimination 'motivated by a class's immutable characteristics' is seen as invidious."[146] But "a plaintiff cannot sustain a [section] 1985(3) claim under a class of one theory."[147]

Council President Heller alleges membership in two potential status-based groups: "Borough Council President" and "resident and motorist."[148] Any alleged animus toward Council President Heller does not appear to be based on an immutable characteristic, but rather on his political role as Borough Council President or his conduct as a resident and motorist. He alleges no facts suggesting the alleged conspiracy targeted either group with class-based discriminatory

21

animus. And to the extent Council President Heller seeks to proceed based on his individual treatment rather than membership in a protected class, Congress through section 1985(3) does not permit a "class of one" theory. We dismiss Council President Heller's section 1985(3) conspiracy claim against Chief Vice with prejudice.

We also dismiss Council President Heller's section 1986 "failure to prevent a section 1985(3) conspiracy" claim against Chief Vice with prejudice. Council President Heller cannot state a claim against Chief Vice under section 1986 because he does not allege a violation of section 1985(3).[149]

### E. We dismiss all remaining claims against the Borough.

Council President Heller asserts all his claims against the Borough under the *Monell* theory of municipal liability. Council President Heller only alleges the Borough's final decision makers "provided the moving force" for the continued "unlawful" use of the license plate reader system knowing Chief Vice and the police department used and would continue to use it in an unauthorized and unlawful manner.[150] The Borough argues it is not liable for two reasons. First, the Borough argues its Council did not enact a policy or custom by majority vote required to establish *Monell* liability.[151] Second, the Borough argues Council President Heller's "moving force" allegation is insufficient.[152] We agree with the Borough. We find Council President Heller has not pleaded facts allowing us to plausibly infer *Monell* liability for a claim other than the Fourth Amendment unreasonable search of the VIPR system to locate Council President Heller through his vehicle movements after knowing the police engaged in the same type of search weeks earlier when looking for Officer Roller's car.

We dismiss without prejudice Council President Heller's Fourth Amendment unreasonable seizure claim against the Borough. He does not allege the Borough Council issued

an official proclamation, policy, or edict to authorize an unreasonable seizure by its Police. Council President Heller only alleges a majority of the Council knew of and permitted the use of a license plate reader system to locate and identify specific individuals within the Borough.[153] Knowing about the use of a license plate reader system does not support a plausible inference the Council acquiesced or demonstrated deliberate indifference to the March 8, 2024 traffic stop. Council President Heller has also not alleged a pattern of behavior which could put the Council on notice of ongoing unreasonable seizures. We dismiss the unreasonable seizure claim against the Borough.

We dismiss without prejudice Council President Heller's First Amendment retaliation claim against the Borough because he alleges no facts showing the Council knew of attempted retaliatory conduct. Council President Heller does not allege the Borough Council adopted a policy or custom of retaliation by acquiescence or deliberate indifferent.

We dismiss without prejudice the Fourteenth Amendment equal protection claim against the Borough. Council President Heller fails to plead facts establishing the existence of similarly situated individuals.[154]

We dismiss without prejudice the defamation stigma-plus claim against the Borough because Council President Heller does not allege the Council adopted a policy or custom allowing the Borough's Police to issue press releases on Facebook about DUI traffic stops. Council President Heller does not allege the Council knew of similar unlawful conduct to assert this claim under a theory of acquiescence or deliberate indifference.

We dismiss without prejudice the section 1983 conspiracy claim against the Borough because Council President Heller does not allege the Borough Council knew of a conspiracy. Council President Heller can only state a claim for civil rights conspiracy by alleging: "(1) two

or more persons conspired to deprive any person of [constitutional rights] . . . ."[155] Satisfying this first element requires alleging the Council "'reached an understanding' to deprive [the plaintiff] of his constitutional rights."[156] Council President Heller does not allege the Council knew of efforts to deprive him of his constitutional rights.

We dismiss with prejudice the section 1985(3) conspiracy and section 1986 claims against the Borough as a matter of law. Council President Heller does not allege the required race- or class-based invidious discrimination element of a section 1985(3) conspiracy claim.[157] And he cannot state a claim against the Borough under section 1986 absent a viable section 1985(3) conspiracy.[158]

## III.    Conclusion

Council President Heller may proceed on his Fourth Amendment unreasonable search claim against the Borough and Chief Vice based on the queries/searches of the computer system on March 8, 2024. He may also proceed on his Fourth Amendment unreasonable seizure claim and section 1983 conspiracy claim based on an alleged unreasonable seizure against Chief Vice. We grant him leave to again amend to possibly plead facts allowing us to plausibly infer a basis for his First Amendment, Equal Protection, and defamation claims. He may also amend to plead a basis for municipal liability consistent with Rule 11.

---

[1] ECF 18 ¶ 16.

[2] Chief Vice represents Council President Heller began serving as a Brookhaven Borough councilmember in 2017. ECF 20-1 at 5. Brookhaven Borough Council meeting minutes identify Terry Heller as Council President as early as January 2020. Brookhaven Borough, *Brookhaven Borough Council Meeting Minutes* (Jan. 13, 2020), https://ecode360.com/BR4223/document/753222641.pdf.

[3] ECF 18 ¶ 8.

24

[4] *United States v. Bowers*, No. 18-292, 2021 WL 4775977, at \*2 (W.D. Pa. Oct. 11, 2021) (quoting Pam Greenberg, Automated License Plate Readers, National Conference of State Legislatures (Feb. 2015)).

The courts considering these questions interchangeably refer to and abbreviate these systems as automatic license plate reader ("ALPR") or license plate reader ("LPR") systems.

[5] *Id.* (quoting Privacy Impact Assessment for the CBP License Plate Reader Technology (July 6, 2020) at 1).

[6] *Com. v. Watkins*, 304 A.3d 364, 380 (Pa. 2023) (Olson, J., dissenting).

[7] *Bowers*, 2021 WL 4775977, at \*2.

[8] *Home*, VIPR.ai (2023), https://vipr.ai/ (last visited Feb. 9, 2026).

[9] *Technology*, VIPR.ai (2023), https://vipr.ai/ (last visited Feb. 9, 2026).

[10] *Home*, VIPR.ai (2023), https://vipr.ai/ (last visited Feb. 9, 2026); *Technology*, VIPR.ai (2023), https://vipr.ai/ (last visited Feb. 9, 2026).

[11] *Beliefs*, VIPR.ai (2023), https://vipr.ai/ (last visited Feb. 9, 2026).

[12] *About us,* VIPR.ai (2023), https://vipr.ai/ (last visited Feb. 9, 2026).

[13] ECF 18 ¶ 29.

[14] *Id.* ¶ 30.

[15] *Id.* ¶¶ 29–30, 34.

[16] *Id.* ¶¶ 31–32, 34–36.

[17] *Id.* ¶ 15.

[18] *Id.* ¶ 8.

[19] *Id.* ¶ 9.

[20] *Id.* ¶ 10.

[21] *Id.*

[22] *Id.* ¶ 11.

[23] *Id.* ¶ 12. Officer Youssef reported observing Council President Heller's vehicle exit a parking-lot passageway, turn right into the outermost left lane rather than the curb lane, and then make a left turn through a steady red light. *Id.* ¶ 11.

25

[24] *Id.* ¶ 13.

[25] *Id.* ¶ 18.

[26] *Id.*

[27] *Id.* ¶ 13.

[28] *Id.* ¶ 14.

[29] *Id.* ¶ 13.

[30] *Id.* ¶ 19.

[31] *Id.* ¶ 20.

[32] *Id.* ¶ 21.

[33] *Id.* ¶ 20.

[34] *Id.*

[35] *Id.* ¶ 20. Members of the public questioned the accuracy of Chief Vice's statement in online comments. *Id.* ¶ 24. Chief Vice responded to those comments with emoji reactions and additional remarks including "body cameras don't lie." *Id.* ¶¶ 24–26. The Borough took no action to remove or alter the published statements despite knowledge Chief Vice continued to engage with Facebook users on behalf of the Police Department regarding Council President Heller's "discontinued criminal prosecution." *Id.* ¶ 27.

[36] *Id.* ¶ 41.

[37] *Id.* ¶ 42.

[38] *Id.* ¶ 43.

[39] *Id.* at 20. Chief Vice started the litigation process by suing Council President Heller and the Borough in Delaware County's Court of Common Pleas for defamation and breach of contract relating to his employment contract in May 2025. *See Vice v. Heller and Borough of Brookhaven*, No. CV-2025-4894, Delaware Cnty. Ct. of Common Pleas. The parties recently completed the pleadings in state court. We have no basis to find the parties set a trial date in state court. The parties will likely be in trial before us under Rule 1 before they reach trial in the state court. We will address these issues in an early March 2026 initial case management conference setting a date certain trial approximately four to six months later.

[40] ECF 18 ¶¶ 44–72.

[41] *Id.* ¶¶ 73–85.

[42] *Id.* ¶ 44–85.

[43] ECF 18.

[44] ECF 20-1 at 3–17. Chief Vice moves to dismiss for failure to state a claim under Federal Rule of Civil Procedure Rule 12(b)(6).

A complaint must state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The purpose of Rule 12(b)(6) is to test the sufficiency of a complaint under the plausibility pleading standard. *Zanetich v. Wal-Mart Stores East, Inc.*, 123 F.4th 128, 138 (3d Cir. 2024). A plaintiff must include "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Huertas v. Bayer US LLC*, 120 F.4th 1169, 1174 (3d Cir. 2024) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Kalu v. Spaulding*, 113 F.4th 311, 325 (3d Cir. 2024) (quoting *Iqbal*, 556 U.S. at 678). "'Plausibly' does not mean 'probably,' but 'it asks for more than a sheer possibility that a defendant has acted unlawfully.'" *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 291 (2025) (quoting *Iqbal*, 556 U.S. at 678). A pleading offering "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" is insufficient. *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)).

Our Court of Appeals requires us to apply a three-step analysis to a 12(b)(6) motion: (1) we "tak[e] note of the elements a plaintiff must plead to state a claim"; (2) we "identify allegations that …'are not entitled to the assumption of truth' because those allegations 'are no more than conclusion[s]'"; and, (3) "'[w]hen there are well-pleaded factual allegations,' we 'assume their veracity' … in addition to assuming the veracity of 'all reasonable inferences that can be drawn from' those allegations … and, construing the allegations and reasonable inferences 'in the light most favorable to the [plaintiff]'…, we determine whether they 'plausibly give rise to an entitlement to relief.'" *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (internal citations omitted).

We may also consider matters of public record when deciding a motion to dismiss. *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted).

[45] ECF 20-1 at 17–20.

[46] ECF 19. The Borough also moves to dismiss for failure to state a claim under Federal Rule of Civil Procedure Rule 12(b)(6). *See supra* note 43.

[47] ECF 20-1 at 20.

[48] ECF 26 at 26.

[49] *See Kentucky v. Graham,* 473 U.S. 159, 165–66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.,* 436 U.S. 658, 690 n. 55 (1978)).

[50] *See Bush v. Pennsylvania*, No. 23-2216, 2023 WL 5339612, at * 2 (E.D. Pa. Aug. 17, 2023) (citing *Bonenburger v. Plymouth Twp.*, 132 F.3d 20, 25 (3d Cir. 1997)); *Draper v. Darby Twp. Police Dep't*, 777 F. Supp. 2d 850, 856 (E.D. Pa. 2011) (citing *Martin v. Red Lion Police Dep't*, 146 F. App'x 558, 562 n.3 (3d Cir. 2005) (noting the police department is not a "person" under section 1983 "because it lacks an identity separate from the municipality of which it is a part")).

[51] ECF 18 ¶¶ 44–51.

[52] *Id.* ¶¶ 45–47.

[53] *Id.* ¶¶ 8–11.

[54] *Id.* ¶ 47. We infer this allegation rests on Council President Heller's assertions the Borough knew Chief Vice used the VIPR system in December 2023 to locate and surveil Officer Roller while out of work on injured-on-duty status. *Id.* ¶¶ 29–30, 34–35.

[55] ECF 20-1 at 16.

[56] *Id.*

[57] *Id.*

[58] ECF 19 at 6–7.

[59] *Carpenter v. United States*, 585 U.S. 296, 304 (2018).

[60] *Id.* (quoting *Soldal v. Cook Cnty.*, 506 U.S. 56, 64 (1992)).

[61] *Katz v. United States*, 389 U.S. 347, 351 (1967).

[62] *Carpenter*, 585 U.S. at 304.

[63] *Katz*, 389 U.S. at 353.

[64] *United States v. Jones*, 565 U.S. 400, 404 (2012) ("We hold that the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'").

[65] *Id.* at 412.

[66] *Carpenter*, 585 U.S. at 309–10.

[67] *Id.* at 311–12.

[68] *Id.* at 310.

[69] *Id.* at 315–16 (holding the government conducted "a search within the meaning of the Fourth Amendment" when it accessed historical cell site location information).

[70] *Id.* at 316 ("Our decision today is a narrow one. We do not express a view on matters not before us: real-time [cell site location information] or 'tower dumps' (a download of information on all the devices that connected to a particular cell site during a particular interval).").

[71] *See, e.g.*, *Schmidt v. Cty. of Norfolk*, — F. Supp. 3d —, 2026 WL 207513, at *1-2 (E.D. Va. Jan. 27, 2026); *Scholl v. Ill. State Police,* 776 F. Supp. 3d 701, 271 (N.D. Ill. 2025) (responding to the challenge to the operation and maintenance of the license plate ready system by finding Illinois's system "is not so intrusive as to invade [the reasonable expectation of privacy in the whole of their physical movements]" and "is not a search under the Fourth Amendment"); *id.* at 710-11 (finding plaintiffs lack standing to challenge the warrantless use of the license plate reader system to retrieve their license plate information because law enforcement has not queried the system for plaintiffs' license plate information and plaintiffs do not allege they intend to engage in conduct which would grant law enforcement statutory authority to query the system in the future); *Schemel v. City of Marco Island Fla.*, No. 22-79, 2025 WL 2958798, at *2-3 (M.D. Fla. Oct 17, 2025) (dismissing a Fourth Amendment search claim with prejudice for failing to plead a cognizable privacy interest which cannot be amended to "change the underlying legal deficiency in the Plaintiff's theory"), *appeal docketed*, No. 25-13913 (11th Cir. Nov. 5, 2025).

[72] *Com. v. McCarthy*, 142 N.E.3d 1090, 1105 (Mass. 2020) (citing *Com. v. Almonor*, 120 N.E. 3d 1183, 1202 (Mass. 2019) (Lenk, J., concurring) ("When police act on real-time information by arriving at a person's location, they signal to both the individual and his or her associates that the person is being watched. . . . To know that the government can find you, anywhere, at any time is—in a word—'creepy.'").

[73] *Id.*

[74] *United States v. Yang*, 958 F.3d 851, 863 (9th Cir. 2020) (Bea, J., concurring).

[75] *Carpenter,* 585 U.S. at 312.

[76] *Id.*

[77] *Id.*; *see also United States v. Jackson*, No. 24-1001, 2025 WL 1530574, at *9 (D. Kan. May 29, 2025) ("Indeed, the court can easily see how the more widespread and pervasive deployment of [automatic license plate reader] cameras (or cameras connected to the [automatic license plate reader s]ystem) could eventually rise to the level of systemic and continuous tracking with which the Supreme Court took issue in *Carpenter*.").

[78] Our Court of Appeals instructs us to apply the "'flexible' test of reasonableness." *United States v. Henley*, 941 F.3d 646, 651 (3d Cir. 2019). "Balancing the totality of the circumstances is the 'general Fourth Amendment approach' used to assess the reasonableness of a contested search." *United States v. Mitchell*, 652 F.3d 387, 403 (3d Cir. 2011) (quoting *United States v.*

*Knights,* 534 U.S. 112, 118 (2001)). "We determine whether reasonable suspicion exists by context and commonsense, . . . mindful that it is something less than what is required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable." *Henley*, 941 F.3d at 651. "Thus, an officer needs only 'a particularized and objective basis for suspecting legal wrongdoing.'" *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

[79] *Carpenter*, 585 U.S. at 317 (quoting *United States v. Martinez–Fuerte,* 428 U.S. 543, 560–561 (1976)).

[80] *Jackson*, 2025 WL 1530574, at *9 (citing *United States v. Ellison*, 462 F.3d 557, 564 (6th Cir. 2006) (Moore, J., dissenting) (noting an officer running a license plate number through a computer database search without heightened suspicion could raise Fourth Amendment concerns); *see also United States v. Lurry*, 483 F. App'x 252, 255 (6th Cir. 2012) (Moore, J., dissenting)).

[81] *State v. Sidor*, 558 P. 3d 621, 632 (Ariz. Ct. App. 2024). Judge Jacobs ultimately concluded suppression was not warranted on the record before him but reached the conclusion in the context of a motion to suppress and after reviewing a developed evidentiary record. *Id.*

[82] We are aware of analysis addressing when individuals challenge both the constitutionality of the license plate reader system and its specific application to them. *See, e.g.*, *Bowers*, 2021 WL 4775977, at *3; *United States v. Graham*, No. 21-645, 2022 WL 4132488, at *4–5 (D.N.J. Sept. 12, 2022) ("In this case, law enforcement's use of [a license plate reader] database limited to a single occurrence on a single day did not reveal private details of Defendant's life. Defendant has failed to meet his burden to show that he has a reasonable expectation of privacy in his location and physical movement as captured through [the license plate reader system]."), *aff'd*, No. 23-3197, 2025 WL 342190 (3d Cir. Jan. 30, 2025) (affirming Judge Martini's findings related to recusal, evidence of drug possession, *Miranda* warnings, and jury instructions without discussing his findings regarding license plate reader systems); *United States v. Sturdivant*, 786 F. Supp. 3d 1098, 1111 (N.D. Ohio 2025) ("[T]he query of a database containing [license plate] information does not violate Mr. Sturdivant's rights under the Fourth Amendment. Therefore, no search occurred for purposes of the Fourth Amendment.") (internal citation omitted); *United States v. Cooper*, No. 23-131, 2025 WL 35035, at *4–7 (E.D. La. Jan. 6, 2025) ("The facts in the record simply do not support a reasonable expectation of privacy in Defendant's movements within the reasoning of *Carpenter*. Accordingly, Defendant has not shown that her Fourth Amendment rights were violated by the Government's warrantless [license plate reader] search of her license plate number."); *United States v. Martin*, 753 F. Supp. 3d 454, 475 (E.D. Va. 2024) ("[T]he Court agrees with the other decisions cited by the Government that individuals have no reasonable expectation of privacy in their license-plate number based on the facts in the record."); *United States v. Jiles*, No. 23-98, 2024 WL 891956, at *18 (D. Neb. Feb. 29, 2024) ("[Law enforcement's] use of the [license plate reader] database did not constitute a "search" within the meaning of the Fourth Amendment."); *United States v. Toombs*, 671 F. Supp. 3d 1329, 1339-41 (N.D. Ala. 2023) (same); *United States v. Porter*, No. 21-87, 2022 WL 124563, at *3 (N.D. Ill. Jan. 13, 2022) (same); *United States v. Brown*, No. 19-949, 2021 WL 4963602, at

*3–4 (N.D. Ill. Oct. 26, 2021) (same); *United States v. Rubin*, 556 F. Supp. 3d 1123, 1124 (N.D. Cal. 2021).

[83] *See, e.g.*, *Graham*, 2022 WL 4132488, at *1 (finding surveillance from businesses near a robbery captured video of the suspect fleeing in his car provided the information to conduct the search of a license plate reader); *Jackson*, 2025 WL 1530574, at *4 (finding police targeted a specific vehicle only after receiving a call from a Drug Enforcement Administration agent stating a specific car owned by a known individual would be in the local police's jurisdiction to pick up five pounds of methamphetamine).

[84] We are guided in part by the contrasts offered in criminal suppression analysis in different fact patterns reviewed by our colleagues. We start with Judge Karas's analysis six months ago where the individual targeted by a license plate reader system alleged law enforcement conducted license plate reader surveillance "without any good-faith law-enforcement justification" over a continuous period exceeding two and one-half years, resulting in more than one hundred documented location reports. *Rinaldi v. Sylvester*, No. 24-272, 2025 WL 2682691, at *17 (S.D.N.Y. Sept. 19, 2025). Although the individual argued law enforcement lacked reasonable suspicion for accessing the license plate reader data, Judge Karas focused on the scope, duration, and aggregation of the data collected, which he analogized to the "all-encompassing record" of movements at issue in *Jones* and *Carpenter*. *Id.* Judge Karas's analysis did not resolve whether officers lacked reasonable suspicion at the time of a particular database query nor did it rest on whether accessing a license plate reader system to generate suspicion, rather than confirm it, raises distinct Fourth Amendment concerns. *Id.* We decline to extend Judge Karas's analysis to Council President Heller's allegations.

Judge Maze addressed two separate Fourth Amendment challenges in *United States v. Toombs*: whether a warrantless license plate reader query violated the defendant's reasonable expectation of privacy and whether the information obtained from the query supported reasonable suspicion to prolong a traffic stop. 617 F. Supp. 3d at 1339–46. Judge Maze rejected the privacy-based challenge and found the database query did not constitute a search because the defendant lacked a reasonable expectation of privacy in his license plate. *Id.* at 1339–42. Judge Maze considered reasonable suspicion only when evaluating whether the officer lawfully prolonged the stop, relying on the defendant's driving behavior and speed before considering the license plate reader information. *Id.* at 1342–46.

Judge Buescher reached a similar posture in *United States v. Jiles*, where the officer observed erratic driving behavior before querying the license plate reader database. 2024 WL 891956, at *2–3. Judge Buescher held the license plate reader query did not constitute a Fourth Amendment search but analyzed reasonable suspicion only in connection with prolonging the stop, not as a prerequisite to accessing the database. *Id.* at *15–19. Judge Buescher further found reasonable suspicion existed independent of the license plate reader information and denied suppressing the evidence from the license plate reader even assuming the database query violated the Fourth Amendment. *Id.* at *19.

Judge Calabrese's decision in *United States v. Sturdivant* also does not resolve the question presented today. Law enforcement used surveillance footage from multiple armed robberies to

31

identify a suspect vehicle by its physical characteristics and then queried license plate reader databases to determine the vehicle's license plate number and owner. *Id.* at 1102–05. Judge Calabrese held the defendant lacked a reasonable expectation of privacy in the exterior appearance of his vehicle or license plate number and concluded the database queries did not constitute a Fourth Amendment search. *Id.* at 1111. Judge Calabrese observed the retrospective nature of license plate reader systems permits vehicle tracking without advance suspicion but did not separately consider whether officers require reasonable suspicion to query a license plate reader database to locate a specific person in real time. *Id.* at 1113. Judge Calabrese's conclusion rested on a record reflecting multiple robberies occurring close in time and location, corroborating surveillance footage, and witness descriptions identifying the suspect vehicle— facts establishing reasonable suspicion to locate the vehicle at issue. *Id.* at 1101–02.

[85] ECF 18 ¶¶ 46–47.

[86] *Id.*

[87] *Monell*, 436 U.S. at 694–95.

[88] *Bush*, 2023 WL 5339612, at \*2 (citing *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009)). A municipal policy under section 1983 is a "statement, ordinance, regulation, or decision officially adopted and promulgated by" the Borough's Council. *Monell*, 436 U.S. at 690. "Policy is made when a 'decisionmaker possess[ing] final authority to establish a municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000) (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996)); *see also Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (Council President Heller must "point to an official proclamation, policy, or edict by a decisionmaker possessing the final authority to establish municipal policy on the relevant subject.").

[89] *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997).

[90] *Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985).

[91] *Jimenez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 250 (3d. Cir. 2007).

[92] *Id.* at 249 (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

[93] *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990).

[94] ECF 18 ¶ 48.

[95] ECF 20-1 at 16–17.

[96] ECF 18 ¶ 10–18.

[97] ECF 26 at 22–24.

[98] *Brendlin v. California*, 551 U.S. 249, 254–59 (2007).

[99] *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

[100] *United States v. Delfin-Colina*, 464 F.3d 392, 396–97 (3d Cir. 2006); *see also United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018) ("Traffic stops are classified as a type of *Terry* [*v. Ohio*, 392 U.S. 1 (1968)] stop, and may be initiated based on a reasonable suspicion that a traffic violation has occurred.").

[101] ECF 20-1 at 16–17 (citing ECF 18 ¶ 11).

[102] ECF 18 ¶ 12 ("At no time did Plaintiff violate any traffic law, and he did not make any sudden turns, he did not make any improper turns into other lanes, and he did not drive through a red light as is falsely stated in the report.").

[103] *Id.* ¶¶ 13–14.

[104] *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." (internal citations omitted)).

[105] ECF 20-1 at 16.

[106] *Rode*, 845 F.2d at 1207.

[107] *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005).

[108] ECF 18 ¶ 16.

[109] *Id.* ¶ 18.

[110] To state a claim for a conspiracy to violate federal civil rights, Council President Heller must allege "(1) two or more persons conspire to deprive any person of [constitutional rights]; (2) one or more of the conspirators performs ... any overt act in furtherance of the conspiracy; and (3) that overt act injures the plaintiff in his person or property or deprives the plaintiff of any right or privilege of a citizen of the United States, with the added gloss under § 1983 that the conspirators act under the color of state law." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 294 n.15 (3d Cir. 2018) (quoting *Barnes Found. v. Twp. of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001)) (alterations in original). Council President Heller alleged (1) Chief Vice and Officers Youssef and Pastuszek conspired to deprive Council President Heller of his Fourth Amendment rights; (2) Officer Youssef executed a pretextual traffic stop lacking reasonable suspicion during the March 8, 2024 traffic stop; (3) which deprived Council President Heller of his Fourth Amendment right to be free from unreasonable seizures; and (4) Chief Vice and Officers Youssef and Pastuszek used their authority as members of the Borough Police to execute the conspiracy. ECF 18 ¶¶ 8–14, 18, 74–76. The facts alleged by Council President Heller allow us to plausibly infer Chief Vice participated in a conspiracy under section 1983 to deprive Council President Heller of his Fourth Amendment rights.

[111] ECF 18 ¶¶ 15, 53.

[112] ECF 20-1 at 4.

[113] *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125–26 (2011) ("[A] a legislator's vote is the commitment of his apportioned share of the legislature's power to the passage or defeat of a particular proposal. The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it.").

[114] ECF 18 ¶¶ 16, 54. Council President Heller's First Amendment retaliation claim would run into a different causation issue if he alleged engaging in the investigatory conduct in his capacity as an elected official. To state a claim for retaliation in his capacity as an elected official, Council President Heller must plead facts supporting an inference the alleged retaliation interfered with his ability to adequately perform his elected duties. *Werkheiser v. Pocono Twp.*, 780 F.3d 172, 181 (3d Cir. 2015) ("[T]he First Amendment may well prohibit retaliation against elected officials for speech pursuant to their official duties only when the retaliation interferes with their ability to adequately perform their elected duties.").

[115] ECF 21-1 at 4–6.

[116] *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

[117] *Morrieson v. City of Jersey City*, No. 18-12974, 2022 WL 819634, at \*4 (D.N.J. Mar. 18, 2022) (quoting *Dondero v. Lower Milford Twp.*, 5 F.4th 355, 361 (3d Cir. 2021)).

[118] *DeFlaminis*, 480 F.3d at 267.

[119] ECF 18 ¶¶ 61–62. Council President Heller also alleges Chief Vice and the Borough "violated [his] Fourteenth Amendment rights in an arbitrary and malicious manner" and "deprived [him] of his liberty" but he does not identify a cognizable liberty interest or describe any deprivation beyond the alleged unequal treatment. *Id.* ¶¶ 59–60.

[120] *Id.* ¶ 17.

[121] ECF 20-1 at 7–8.

[122] *Bryant v. Pottsgrove Sch. Dist.*, No. 25-3140, 2025 WL 2691044, at \*8 (E.D. Pa. Sept. 19, 2025); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 563 (2000).

[123] *Mack v. Warden Loretto FCI*, 839 F.3d 286, 305 (3d Cir. 2016) (citing *Hassan v. City of N.Y.*, 804 F.3d 277, 294, 298 (3d Cir. 2015)).

[124] *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006).

[125] *Bryant*, 2025 WL 2691044, at \*8.

[126] *Id.* at \*8 (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 244-45 (3d Cir. 2008)).

[127] *Perano v. Twp. of Tilden*, 423 Fed. App'x 234, 238 (3d Cir. 2011).

[128] *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008) (internal citation and quotation marks omitted).

[129] *Stradford v. Sec'y Pa. Dep't of Corrs.*, 53 F.4th 67, 74 (3d Cir. 2022) (citing Hill, 455 F.3d at 239).

[130] *Perano*, 423 F. App'x at 238–39.

[131] *1201 W. Girard Ave., LLC v. Clarke*, No. 23-3194, 2024 WL 4403866, at *2 (3d Cir. Oct. 4, 2024) (internal citation and quotation marks omitted).

[132] *Baucum v. Rutgers Univ.*, No. 23-20707, 2025 WL 3754177, at *10 (D.N.J. Dec. 29, 2025) (citing *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011)).

[133] ECF 18 ¶¶ 65–72.

[134] *Id.* ¶¶ 67, 71.

[135] ECF 20-1 at 8–12.

[136] *Hill*, 455 F.3d at 236.

[137] *D & D Assocs., Inc. v. Bd. of Educ. of N. Plainfield*, 552 F. App'x 110, 113 (3d Cir. 2014) (quoting *Clark. v. Twp. of Falls*, 890 F.2d 611, 619 (3d Cir. 1989)).

[138] *Santos v. York Cnty. Dist. Att'y*, No. 23-293, 2024 WL 6473639, at *4 (M.D. Pa. Jan. 11, 2024) (quoting *D & D Assocs.*, 552 F. App'x at 114).

[139] ECF 18 ¶ 71.

[140] *Id.* ¶ 72.

[141] Congress through section 1985(3) prohibits two or more persons to conspire to deprive any person or class of persons equal protection of the laws. *See* 42 U.S.C. § 1985(3); *see also Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) ("Section 1985(3) permits an action to be brought by one injured by a conspiracy formed for the purpose of depriving, either directly or indirectly, any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws.") (internal quotation marks and citation omitted). Council President Heller must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Davis v. Wigen*, 82 F.4th 204, 214 (3d Cir. 2023) (quoting *United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 828–29 (1983)).

[142] Council President Heller must allege the following to state a plausible claim under section 1986: "(1) the defendant had actual knowledge of a section 1985 conspiracy, (2) the defendant

had the power to prevent or aid in preventing the commission of a § 1985 violation, (3) the defendant neglected or refused to prevent a § 1985 conspiracy, and (4) a wrongful act was committed." *Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994); *see also Foskey v. Rendell*, 261 F. App'x 428, 430 (3d. Cir. 2008) (holding a section 1986 claim derives from a section 1985 claim).

[143] ECF 20-1 at 17–20.

[144] *Farber*, 440 F.3d at 135 (citations omitted, emphasis in original); *see also Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997) (The "reach of [section] 1985(3) is limited to private conspiracies predicated on 'racial, or perhaps otherwise class based, invidiously discriminatory animus.'") (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 103 (1971)).

[145] *Nagle v. Pottsville Area Sch. Dist.*, No. 24-1808, 2025 WL 1689406, at *13 (M.D. Pa. June 16, 2025) (quoting *Farber*, 440 F.3d at 135).

[146] *Id.* (quoting *Farber*, 440 F.3d at 142).

[147] *Monighan v. Wolf*, No. 23-427, 2024 WL 5697301, at *4 (M.D. Pa. Jan. 23, 2024), R. & R. *adopted*, No. 23-427, 2024 WL 5695917 (M.D. Pa. Feb. 21, 2024) (citing *Tomino v. City of Bethlehem*, No. 08-6018, 2010 WL 1348536, at *17 (E.D. Pa. Mar. 31, 2010)).

[148] ECF 18 ¶ 17 ("[A]s a resident and motorist of Brookhaven Borough, [Council President Heller] was treated differently from other similarly situated individuals without a rational basis for differential treatment.").

[149] *See Est. of Paone by & through Paone v. Plymouth Twp.*, No. 22-2178, 2023 WL 5044952, at *7 (E.D. Pa. Aug. 8, 2023) ("Since section 1986 violations are preconditioned on a section 1985 violation, 'if the claimant does not set forth a cause of action under the latter, its claim under the former necessarily must also fail.'") (quoting *Rogin v. Bensalem Twp.*, 616 F.2d 680, 696 (3d Cir. 1980)); *see also Koorn v. Lacey Twp.*, 78 F. App'x 199, 207-08 (3d Cir. 2003); *Rose v. Guanowsky*, No. 21-3280, 2022 WL 910341, at *2 (3d Cir. Mar. 29, 2022).

[150] ECF 18 ¶¶ 34–35.

[151] ECF 19 at 4–5.

[152] *Id.* at 6–7.

[153] ECF 18 ¶¶ 34–35.

[154] *See supra* Section II.D.2.

[155] *Jutrowski*, 904 F.3d at 294 n.15 (3d Cir. 2018) (internal citations omitted).

[156] *Id.* at 294 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150-52 (1970)); *see also Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010) (requiring

plaintiffs to plead "'enough factual matter (taken as true) to suggest that an agreement was made,' in other words, 'plausible grounds to infer an agreement.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

[157] *See supra* Section II.D.4.

[158] *Id.*