**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TERRY P. HELLER** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 25-5550** |
| | : | |
| **BROOKHAVEN BOROUGH,** | : | |
| **MICHAEL L. VICE** | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                                          **July 27, 2026**

The citizens of a local borough presumably expect the president of their borough council and their police chief to protect their community's best interests and not engage in personal animus to embarrass or harass the other out of spite. We today review after discovery claims a police chief directed his officers to track the council president's movements late on a March 2024 Friday night and to then arrest him after the council president admitted drinking, joked about marijuana in his car, and roadside testing raised concerns of his capacity to drive home. We do not condone political retaliation through unreasonable searches and arrests. But the council president must do more than offer speculation when suing the police chief for violating his Fourth Amendment rights to be free from unreasonable searches and seizures. We afforded the council president discovery based on allegations which are now unsupported in extensive discovery.

We dismiss the search claim absent credible evidence (not speculation based on animus) of the police chief's personal involvement in directing the questionable search. We also dismiss the seizure claim as the police chief is entitled to qualified immunity for allowing the borough's officers to follow the evidence by arresting the council president upon probable cause (including his admissions of drinking and jokes about marijuana in the car) until further blood testing would later allow the local district attorney to decline to prosecute the council president for driving under

the influence. We dismiss the conspiracy claim against the police chief finding the council president did not adduce facts allowing a reasonable jury to find the police chief's liability to the council president under the Fourth Amendment.

## I.    Undisputed material facts[1]

Brookhaven Borough residents elected Terry Heller to Borough Council in January 2018.[2] He served on Borough Council through December 2025 and as Council President during part of his tenure.[3] Michael Vice served as Brookhaven Borough's Chief of Police during part of Council President Heller's service from March 2021 until August 2024.[4]

Police officers, including the current Police Chief Timothy Habich then working as an officer under Chief Vice understood Council President Heller and Chief Vice did not particularly care for one another and viewed their mutual dislike as apparent.[5] Current Chief Habich recalled Chief Vice calling Council President Heller a liar and making other negative comments about him.[6] He understood Council President Heller and Chief Vice had professional disputes, including a disagreement concerning the approval and purchase of a police vehicle.[7] Current Chief Habich further understood Chief Vice's dislike of Council President Heller was well known within the Police Department.[8]

### Brookhaven Police use of VIPR

Brookhaven Police Department uses two of several electronic systems to assist with its work—JNET and VIPR.[9] Officers can query a specific license plate number in JNET to obtain ownership information from PennDOT records, including the vehicle owner's name and address.[10] VIPR offers a different investigative tool; it is a vehicle intelligence and automated license plate recognition system sold only to law-enforcement agencies.[11] The VIPR system captures an image of a vehicle when it passes a VIPR camera.[12] Officers can query a specific license plate number in

VIPR and VIPR returns the vehicle's make, model, color, body style, camera location, and historical locations.[13] It does not provide ownership information.[14] Chief Vice introduced and brought VIPR to the Brookhaven Police Department while serving as Chief because he viewed it as a useful investigative tool for officers.[15] Chief Vice and the Police Department implemented VIPR without a written policy governing its use or a formal training program.[16] Officers received a vendor-supplied training video; Brookhaven Borough did not provide written materials, documented procedures, or guidelines.[17]

### *Officers' use of VIPR on a fellow officer draws scrutiny.*

Chief Vice queried fellow Brookhaven Officer Brent Roller's license plate in VIPR twice on December 29, 2023 to locate and surveil Officer Roller while he remained off duty due to injury.[18] Brookhaven Sergeant Ryan Eastman queried Officer Roller's license plate in VIPR twenty-nine times between December 29 and December 31, 2023 to determine Officer Roller's movements, including when he visited a local gym while out of work due to injury.[19] Chief Vice explained officers suspected Officer Roller had visited the gym while on injury leave and he approved the search to resolve the officers' "bickering" about whether Officer Roller had done so.[20] He explained he "knew that the easiest way to put [the bickering] to rest was to see if [Officer Roller's] tag in fact went through that intersection."[21] Chief Vice acknowledged the search did not relate to a criminal investigation.[22]

Current Chief Habich understood Chief Vice also did not "see eye to eye" with Officer Roller and recalled Chief Vice making clear his intent to find a basis to terminate Officer Roller's employment.[23] Current Chief Habich also recalled Officer Michael Connor reporting he overheard Chief Vice and Sergeant Eastman discuss their belief Officer Roller committed insurance or workers' compensation fraud and their intention to "catch him" and Officer Connor also reporting

3

Chief Vice drove to the gym and sat in its parking lot to determine whether Officer Roller exercised there while on injury leave.[24] Officer Roller later learned officers queried his license plate and Chief Vice allegedly sat outside his gym to see whether he worked out.[25]

Council President Heller learned of the VIPR searches in late January or early February 2024 and contacted several members of Borough Council.[26] He recalled some council members expressed concern and planned to investigate the searches, but the Borough Council had not completed an inquiry before March 2024.[27] Council President Heller's wife and fellow Borough Council member Cheri Heller learned of the VIPR searches from her husband in February 2024.[28]

### Officers' use of VIPR on Borough President Heller's car.

Council President Heller went to Chili's on March 8, 2024 with several individuals and drank beer there.[29] He occasionally went to Chili's after council meetings for beers with other officials and residents.[30] Current Chief Habich recalled one occasion before March 8, 2024 when Chief Vice said, "Terry Heller's going to be at Chili's tonight. There's an easy DUI if you want to get one."[31] Current Chief Habich did not act on the comment and does not know whether Chief Vice made the comment to any other officers.[32] He also recalled Council President Heller and Chief Vice continued not to get along during the weeks and months preceding March 8, 2024.[33]

Officer Orabi Youssef saw Borough President Heller's vehicle in the Chili's parking lot around 11:14 p.m. on March 8, 2024 while conducting business checks.[34] Officer Youssef ran the vehicle's license plate through JNET and identified the registered owner as Council President Heller.[35] Officer Youssef then queried Counsil President Heller's license plate number in VIPR at 11:24 p.m. to "figure out how long it[ had] been sitting, or try to ascertain how long it was at the Chili's."[36] Officer Youssef called on-duty Officer Joseph Pastuszek and reported his findings because Chili's "appeared to be closed, so it was odd that [Council President Heller's] vehicle was

4

in the parking lot."[37] Officer Pastuszek then ran Council President Heller's license plate in VIPR without Officer Youssef's knowledge or direction.[38] Officer Pastuszek similarly queried Council President Heller's license plate in VIPR to "see[] how long it[ had] been there" as he could use VIPR to "look at cameras in the area and see how long that vehicle may have been there and see if [it] left or came back."[39] Officer Youssef queried only Council President Heller's license plate in VIPR on March 8, 2024.[40]

Council President Heller left Chili's, turned onto Edgemont Avenue, and then pulled into the Wawa lot.[41] He remained in the Wawa lot for about ten to twelve minutes while on a phone call.[42] Officer Youssef reported seeing Council President Heller's vehicle turn left onto Edgemont Avenue and then turn left into the Giant Supermarket parking lot.[43] Officer Youssef initiated a traffic stop at about 11:49 p.m. based on his observations of Council President Heller's operation of his vehicle.[44] Chief Vice was not physically present at the scene when Officer Youssef initiated the stop. The Police Department assigned Officers Youssef and Pastuszek as the only Brookhaven officers on duty this night.[45]

Officer Youssef approached Council President Heller's vehicle and spoke with him.[46] Council President Heller asked "what, are you guys targeting me" and Officer Youssef responded he observed the vehicle make a wide right turn into the outermost lane when leaving Wawa and then make a left turn on red.[47] Officer Pastuszek then arrived at the scene to provide assistance.[48] Officer Youssef then muted his body-camera microphone for almost six minutes and called Chief Vice and Sergeant Eastman from the scene.[49] Officer Youssef told Chief Vice and Sergeant Eastman he had stopped Council President Heller and began a DUI investigation.[50] Officer Youssef returned to Council President Heller's vehicle and asked whether he had anything to drink.[51] Council President Heller said he had "two drinks in three and a half hours."[52] Officer

Youssef told Council President Heller he smelled "alcoholic drinks coming out of the car" and asked if he could "run" Council President Heller "through some sobriety tests to make sure [he's] good to go."[53] Officer Youssef conducted field sobriety testing and then told Council President Heller he needed to get a breathalyzer.[54] Neither Officer Youssef nor Officer Pastuszek had a breathalyzer at the scene and Officer Youssef said he would "run back real quick" to get one.[55] Officer Youssef returned to his vehicle, began driving, and muted his body-camera microphone.[56] Officer Pastuszek stayed with Council President Heller at the scene.[57] Council President Heller mentioned being targeted multiple times.[58]

Officer Youssef returned approximately three minutes later and continued field sobriety testing.[59] Council President Heller blew into a breathalyzer which showed a blood alcohol concentration of .06.[60] Officer Youssef returned to his vehicle and muted his body-camera microphone for approximately two minutes.[61] He then told Council President Heller he saw signs of impairment and asked him to submit to a blood test.[62] Council President Heller agreed but objected when Officer Youssef explained he would need to transport him to the hospital in handcuffs.[63] Council President Heller asked Officer Youssef to call Chief Vice and let Council President Heller "talk to him."[64] Officer Youssef and Council President Heller called each other by their first names throughout the exchange.[65]

Council President Heller ultimately agreed Officer Youssef could drive him to the hospital for a blood draw and then take him home.[66] He asked Officer Youssef to handcuff him in front but Officer Youssef responded policy did not allow front-cuffing.[67] Council President Heller also joked about having a "bag of weed" in his vehicle and then confirmed he had made a joke.[68] Officer Youssef then handcuffed Council President Heller and placed him in the back seat of the patrol vehicle.[69] Officers Youssef and Pastuszek muted their body-camera microphones for

approximately two minutes while they spoke.[70] Officer Youssef then left the scene with Council President Heller.[71] Officer Pastuszek kept his body-camera microphone muted, returned to his vehicle, and spoke with Chief Vice for over eight minutes.[72] Officer Youssef transported Council President Heller to the hospital where Council President Heller submitted to a blood draw and then drove Council President Heller home.[73] Council President Heller's wife texted Chief Vice the next morning and asked him to "please thank and apologize to Officer Youssef and Officer Pastuszak" for the night before.[74]

### The District Attorney does not prosecute the DUI citation.

Brookhaven Police cited Council President Heller with traffic violations stemming from the March 8, 2024 traffic stop but the Delaware County District Attorney's Office did not charge him with driving under the influence.[75] The District Attorney's Office advised Chief Vice on March 26, 2024 it closed the suspected DUI investigation because Council President Heller's blood alcohol level did not support criminal charges.[76]

### The Borough investigates and Chief Vice resigns because of Council President Heller.

The Borough placed Chief Vice on administrative leave on April 18, 2024.[77] Current Chief Habich became acting Chief in April 2024.[78] Current Chief Habich "encountered administrative difficulty regaining access to departmental systems" upon assuming command because Chief Vice "had revoked" other officers' access privileges and left himself "as the sole administrator for multiple systems."[79] The Borough retained a private law firm on April 25, 2024 to conduct an internal investigation into allegations involving the Police Department and Chief Vice.[80] Chief Vice submitted a resignation letter on September 10, 2024.[81] He identified Council President Heller as the reason for his resignation.[82] The private law firm produced a ninety-one-page

attorney-client investigation report on November 8, 2024.[83] The report recommended future policy changes related to VIPR use.[84]

### *Council President Heller sues Chief Vice and the Borough*

Council President Heller sued Chief Vice and the Borough for damages in late September 2025 during his campaign for Borough Mayor and later amended his allegations after losing the mayoral race.[85] We allowed his claims for unlawful search and seizure under the Fourth Amendment, civil rights conspiracy, and municipal liability as to the unlawful search claim proceed to discovery.[86] The parties proceeded into discovery. We denied summary judgment as to the Borough on the municipal liability claim arising from the unlawful search using the VIPR system.[87]

## II.    Analysis

Chief Vice timely moved for summary judgment on all Council President Heller's claims.[88] Council President Heller opposes summary judgment largely relying on his allegations.[89] We grant summary judgment for Chief Vice on all claims.

### A. We dismiss Council President Heller's Fourth Amendment unreasonable search claim because he did not adduce evidence of Chief Vice's personal involvement.

Chief Vice moves for summary judgment on Council President Heller's Fourth Amendment unreasonable search claim arguing the record fails to establish his personal involvement in the search.[90] Council President Heller responds Current Chief Habich's testimony concerning Chief Vice's statement months earlier—"Terry Heller's going to be at Chili's tonight. There's an easy DUI if you want to get one"—together with the officers' positioning near Chili's, the query of only Council President Heller's license plate, and Chief Vice's earlier use of VIPR creates a genuine dispute of material fact as to whether Chief Vice directed or participated in the VIPR query on March 8, 2024.[91] Council President Heller's argument is speculation based on

speculation. We find no facts creating a genuine issue of material fact as to Chief Vice's personal involvement in the March 8, 2024 VIPR search. We agree with Chief Vice.

A section 1983 claim for unreasonable search and seizure requires a plaintiff plead: "(a) the actions of the police officers constituted a search or seizure within the meaning of the Fourth Amendment; and (b) the actions were unreasonable in light of the surrounding circumstances."[92] "[T]he defendant must have been personally involved in the constitutional violation to be held liable."[93] A plaintiff must show the defendant "actively participate[d] in the search" to establish personal involvement in the Fourth Amendment unreasonable search and seizure context.[94] Personal involvement can be proven "by describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct."[95] "Although [we] can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive."[96]

Council President Heller did not adduce facts allowing us to find a genuine issue for a reasonable jury to find Chief Vice personally participated in or directed the March 8 VIPR queries. The record places Chief Vice in contact with Officer Youssef only after Officer Youssef stopped Council President Heller and began the DUI investigation. Council President Heller offers no record evidence showing Chief Vice knew Officers Youssef or Pastuszek planned to query Council President Heller's license plate. No record evidence shows Chief Vice instructed either officer to use VIPR, directed either officer to position themselves near Chili's on March 8, or communicated with either officer before the queries or stop.

Current Chief Habich's account of Chief Vice's earlier comment on an unknown date does not bridge this evidentiary gap. The comment identified Council President Heller, Chili's, and the possibility of a DUI investigation. But it did not mention VIPR, direct an officer to query Council

President Heller's plate, or refer to March 8, 2024. Current Chief Habich did not place the comment on a specific date, did not act on the comment, and does not know whether Chief Vice made it to Officers Youssef or Pastuszek. Council President Heller pleads Chief Vice made the comment "in the months preceding the arrest."[97] A jury could infer Chief Vice disliked Council President Heller or viewed his visits to Chili's as presenting a possible DUI enforcement opportunity. But a jury could not reasonably infer from this comment Chief Vice later directed two different officers to query Council President Heller's license plate on March 8.

The surrounding circumstances also do not supply the missing connection. We agree Officer Youssef's decision to query only Council President Heller's license plate appears "odd," as Current Chief Habich observed and Council President Heller emphasizes.[98] Officer Pastuszek's later independent query adds to the concern. Those facts may allow a jury to find the officers' use of VIPR constituted an unconstitutional search and support Council President Heller's separate claim against the Borough. But they do not connect Chief Vice to either query. Chief Vice's earlier use of VIPR involving Officer Roller also does not establish personal involvement here. The Officer Roller incident shows Chief Vice knew how officers could use VIPR and had previously used the system to obtain information about a particular vehicle. But his earlier use involving another person does not permit a reasonable inference Chief Vice directed the March 8, 2024 queries of Council President Heller's license plate. Council President Heller still must adduce evidence connecting Chief Vice to the challenged queries. He has not done so.

Council President Heller instead asks us to infer Chief Vice communicated an intent to target him months earlier, later somehow conveyed this intent to Officers Youssef or Pastuszek through unidentified means, caused those officers to position themselves near Chili's, and directed them to query his license plate. The record supports none of these intermediate steps. A nonmovant

may rely on reasonable inferences from record evidence but "an inference based upon speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment."[99]

No evidence links Chief Vice to the VIPR queries before they occurred. Council President Heller cannot establish Chief Vice's personal involvement in the alleged search. We grant summary judgment for Chief Vice on the Fourth Amendment unreasonable search claim.

**B.   We dismiss Council President Heller's Fourth Amendment unreasonable seizure claim because Chief Vice is entitled to qualified immunity.**

Council President Heller also claims Chief Vice violated his Fourth Amendment rights to be free from unreasonable seizure on March 8, 2024. He cites the calls to Chief Vice after the search and after the officers decided to stop Council President Heller's car without speaking to Chief Vice. The later conversations are not recorded and may give rise to a fair inference of Chief Vice's involvement in directing an arrest. He cannot guess as to what the officers and Chief Vice discussed but we know the officers placed Council President Heller in handcuffs and transported him to the station.

Chief Vice had some involvement in the arrest. He instead argues qualified immunity shields his conduct concerning Council President Heller's seizure.[100] He relies upon the undisputed fact Officer Youssef initiated the traffic stop and DUI investigation before contacting him.[101] Chief Vice argues the record shows only he declined to intervene in an investigation already underway and allowed the officers at the scene to continue without his assistance.[102] Council President Heller responds the seizure resulted from a conspiracy Chief Vice orchestrated for political reasons and the Fourth Amendment prohibits a supervisory official from arranging a retaliatory arrest.[103] He argues longstanding law prohibits retaliatory governmental action motivated by political animus and the use of official authority to direct targeted surveillance against a political adversary and relies on our Court of Appeals's reasoning twenty years ago in *Thomas*.[104] Council President Heller

is correct if he can show this arrest is without merit and based on political retaliation and targeting; but this arrest is based on facts from the scene presented by Officers Youssef and Pasternak. We agree qualified immunity precludes Chief Vice's liability for the arrest.

"An official sued under [section] 1983 for an alleged constitutional violation is entitled to qualified immunity unless he (1) violated a constitutional right that (2) was clearly established when he acted."[105] "Where a defendant asserts a qualified immunity defense in a motion for summary judgment, the plaintiff bears the initial burden of showing that the defendant's conduct violated some clearly established statutory or constitutional right."[106] "Only if the plaintiff carries this initial burden must the defendant then demonstrate that no genuine issue of material fact remains as to the 'objective reasonableness' of the defendant's belief in the lawfulness of his actions."[107] "For a right to be 'clearly established,' the contours of that right 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"[108] Existing case law "must give the official 'fair warning' that his conduct is unconstitutional."[109] "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law."[110]

We may resolve qualified immunity on either prong.[111] We begin and end with whether Council President Heller identifies a clearly established right. Even assuming Chief Vice's conduct contributed to an unconstitutional seizure, Council President Heller does not identify precedent placing the unlawfulness of Chief Vice's conduct beyond debate.

The summary judgment record does not allow a reasonable jury to find Chief Vice arranged the stop or initiated Council President Heller's detention. Officer Youssef stopped Council President Heller and began the DUI investigation before contacting Chief Vice. Chief Vice did not participate at the scene. He also did not observe the alleged traffic violations or Council President

12

Heller's interactions with the officers. The record shows only Officer Youssef informed Chief Vice of an ongoing traffic stop and DUI investigation before Chief Vice allowed the officers at the scene to continue without his assistance.

Council President Heller also did not adduce evidence Chief Vice knew Officer Youssef lacked lawful grounds to continue the investigation. Officer Youssef told Chief Vice he had stopped the Council President and initiated a DUI investigation. And "[a] police officer is generally entitled to rely on information conveyed by other officers."[112] Nothing in the record shows Officer Youssef told Chief Vice he observed no traffic violation or lacked evidence supporting a DUI investigation. A reasonable official in Chief Vice's position could leave the roadside assessment to the officers who observed the driving and interacted with Council President Heller.

The relevant question is therefore whether existing precedent gave Chief Vice fair warning he violated the Fourth Amendment by declining to terminate an already initiated traffic stop and DUI investigation after an officer contacted him from the scene. Council President Heller identifies no decision recognizing such an obligation under comparable circumstances. Our Court of Appeals in *Thomas* addressed retaliatory government action prompted by protected conduct in the context of a First Amendment retaliation claim.[113] No First Amendment retaliation claim remains against Chief Vice. The surviving claim concerns Chief Vice's alleged involvement in a Fourth Amendment seizure. Our Court of Appeals in *Thomas* does not address whether a police chief violates the Fourth Amendment by allowing officers to continue a traffic stop and DUI investigation already underway when they contact him. Council President Heller is seemingly arguing a police chief has a constitutional obligation to stop an investigation into a suspected traffic offense when the police chief and the investigated person do not like each other. His theory would allow citizens adverse to a police chief to violate the law with impunity and then argue the arrest

13

is simply because he does not get along with the police chief. We will not stretch our Court of Appeals's reasoning in *Thomas* to void police work based on a traffic stop without evidence of the stop lacked any probable cause.

Council President Heller does not establish Chief Vice violated a clearly established Fourth Amendment right by allowing the officers to continue an investigation already underway. We grant summary judgment for Chief Vice on the Fourth Amendment seizure claim based on qualified immunity.

### C. We grant summary judgment dismissing Council President Heller's civil rights conspiracy claim because no underlying constitutional claim remains against Chief Vice.

Chief Vice also argues the record fails to establish a section 1983 civil rights conspiracy claim because Council President Heller adduces no evidence Chief Vice reached an agreement with Officers Youssef or Pastuszek to violate his Fourth Amendment rights.[114] Council President Heller counters Current Chief Habich's account of Chief Vice's Chili's comment, together with the officers' positioning near Chili's, the query of only his license plate, the stop twenty-five minutes later, and Chief Vice's earlier use of VIPR involving Officer Roller permits a reasonable jury to infer an agreement to target and seize him.[115]

"To prevail on a conspiracy claim under [section] 1983, a plaintiff must prove that persons acting under color of state law reached an understanding to deprive him of his constitutional rights . . . ."[116] He "must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action."[117] But "[t]here can be no civil conspiracy to commit an unlawful act under [section] 1983 where the plaintiff has not proven a deprivation of a constitutional or statutory right or privilege."[118] A civil rights conspiracy claim "rises and falls" with the underlying constitutional claim.[119]

14

We need not reach an analysis of whether Chief Vice reached an agreement with the officers. Council President Heller predicates his conspiracy claim on the same alleged Fourth Amendment search and seizure addressed above. Because Council President Heller has no actionable Fourth Amendment claim against Chief Vice, he "cannot have a corresponding and dependent claim against [Chief Vice] for having engaged in a conspiracy to deprive him of those rights."[120] We grant summary judgment for Chief Vice on the section 1983 civil rights conspiracy claim.

### III.    Conclusion

We dismiss Council President Heller's Fourth Amendment unreasonable search claim against Chief Vice for lack of credible evidence of Chief Vice's personal involvement in the questionable search. The jury will be charged with determining whether the Borough is liable under the Fourth Amendment for allowing these types of VIPR searches without a policy or guidance particularly after questions were raised about the Borough's continuing inappropriate use of the VIPR system.

We dismiss Council President Heller's Fourth Amendment unreasonable seizure claim against Chief Vice. Chief Vice, notwithstanding alleged questionable leadership and conduct shown during discovery, is entitled to qualified immunity for relying upon the officer's reports of Council President Heller's driving conduct, field tests, admissions, and request to follow the evidence. Chief Vice would have betrayed his oath had he chosen to disregard the officers' reports and release a council president simply because they know (and may not like) each other. Chief Vice is entitled to qualified immunity.

We dismiss the conspiracy claim against Chief Vice.

15

[1] Our Policies require parties moving for relief under Fed. R. Civ. P. 56 include a Statement of Undisputed Material Facts and an appendix in support of summary judgment. Chief Vice filed his Motion, Statement of Undisputed Material Facts ("Vice SUMF"), Memorandum in support of summary judgment, and Appendix ("Appx"). *See* ECFs 47, 47-1, 48, 48-1. Borough Council President Heller opposed the motion, responded to Chief Vice's Statement of Undisputed Material Facts, included Additional Facts Precluding Summary Judgment ("Heller SUMF"), and added a supplemental Appendix. *See* ECFs 50, 50-1. Chief Vice filed a reply brief and responded to Council President Heller's Additional Facts. *See* ECFs 53, 54.

We do not rely on allegations absent evidence in discovery when addressing a summary judgment motion. Summary judgment is referred to as "put up or shut up" time. *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) ("[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." (quoting *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109–10 (3d Cir. 1985))).

A disputed fact is "genuine" only if there is sufficient *evidentiary* basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" "if its resolution 'might affect the outcome of the suit under the governing law.'" *Mall Chevrolet, Inc. v. General Motors LLC*, 99 F.4th 622, 631 (3d Cir. 2024) (quoting *Anderson*, 477 U.S. at 248).

[2] Vice SUMF ¶ 1.

[3] *Id.*

[4] *Id.* ¶ 3.

[5] Appx.0431.

[6] *Id.* at 0432–33.

[7] *Id.* at 0432.

[8] *Id.* at 0434.

[9] Neither party defines "JNET." The record refers to "VIPR" as the product name and does not establish it is an acronym.

[10] Appx.0326–27.

[11] *Id.* at 0715, 0736.

[12] *Id.* at 0782–83.

[13] *Id.* at 0786.

[14] *Id.* at 0816.

[15] *Id.* at 0286–89.

[16] Heller SUMF ¶¶ 20, 22.

[17] *Id.* ¶ 21.

[18] Vice SUMF ¶ 24; Heller SUMF ¶¶ 13–14; Appx.0845–47.

[19] *Id.*; Appx.0685–87.

[20] *Id.* at 0335–36.

[21] *Id.*

[22] *Id.* at 0338.

[23] *Id.* at 0451.

[24] *Id.* at 0447–48.

[25] *Id.* at 0686.

[26] *Id.* at 0152–53.

[27] *Id.* at 0152–53.

[28] *Id.* at 0226–27.

[29] Vice SUMF ¶ 38.

[30] *Id.* ¶ 37.

[31] Heller SUMF ¶ 3.

[32] Appx.0494–95.

[33] *Id.* at 0441.

[34] Vice SUMF ¶ 46.

[35] *Id.* ¶ 47.

[36] *Id.* ¶¶ 47, 49; Appx.0546, 0821.

[37] Vice SUMF ¶ 47; Appx.0529.

[38] Vice SUMF ¶ 51; Appx.0821.

[39] Appx.0647.

[40] Heller SUMF ¶ 9.

[41] Vice SUMF ¶ 44.

[42] *Id.*

[43] *Id.* ¶ 60.

[44] *Id.* ¶ 63; Appx.0040

[45] Vice SUMF ¶ 14.

[46] *Id.* ¶ 64.

[47] Appx.0830.

[48] Vice SUMF ¶ 82, Appx.0831.

[49] Vice SUMF ¶ 64; Appx.0830.

[50] Vice SUMF ¶¶ 66–67.

[51] Appx.0830.

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] Appx.0831.

[58] Appx.0830–31.

[59] Appx.0831.

[60] *Id.*

[61] Appx.0832.

[62] *Id.*

[63] *Id.*

---

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *Id.* at 0831–32.

[71] *Id.* at 0832.

[72] *Id.* at 0831. Officer Pastuszek's body-camera video shows him dialing Chief Vice and remaining on the call for over eight minutes. *Id.*

[73] *Id.* at 0832, 0837.

[74] *Id.* at 0215–16.

[75] *Id.* at 0102.

[76] *Id.* at 0839.

[77] *Id.* at 0483.

[78] *Id.* at 0428–29. The Borough appointed him Chief in April 2025. *Id.*

[79] Heller SUMF ¶ 29.

[80] Vice SUMF ¶ 11.

[81] Appx.0482.

[82] Heller SUMF ¶ 6.

[83] Vice SUMF ¶ 12.

[84] Appx.0895.  The Borough's municipal liability for a lack of policy addressing the use of VIPR will proceed to trial in two weeks.

[85] ECFs 1, 18. Chief Vice started the litigation process by suing Council President Heller and the Borough in Delaware County's Court of Common Pleas for defamation and breach of contract relating to his employment contract in May 2025. *See Vice v. Heller and Borough of Brookhaven*, No. CV-2025-4894, Delaware Cnty. Ct. of Common Pleas. The parties recently completed the pleadings in state court with no defined trial date.

[86] ECFs 27, 28. We dismissed Council President Heller's First Amendment retaliation claim in part and dismissed his sections 1985(3) and 1986 conspiracy claims with prejudice. *Id.* We dismissed his remaining First Amendment retaliation, Fourteenth Amendment equal protection, defamation, and municipal liability claims without prejudice with leave to amend. *Id.* Council President Heller did not amend.

[87] ECF 63.

[88] ECF 47. Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is "genuine" if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). The "mere existence of a scintilla of evidence" favoring the non-moving party does not prevent summary judgment. *See SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). When determining whether a disputed fact is genuine, we draw all inferences in favor of the non-moving party. *See id*. We do not weigh evidence or make credibility determinations. *See Spivack v. City of Phila.*, 109 F.4th 158, 166 (3d Cir. 2024) (citing *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021)).The Supreme Court "outlined two closely related methods for a movant to succeed at summary judgment": (1) under the "standard approach," the moving party may produce material facts, genuinely undisputed, entitling it to judgment as a matter of law; and (2) under the "*Celotex* approach," the moving party "may instead demonstrate that the non-moving party has not made 'a showing sufficient to establish the existence of an element essential to that party's case . . . *on which that party will bear the burden of proof at trial*." *See Mall Chevrolet, Inc. v. Gen. Motors LLC*, 99 F.4th 622, 630 (3d Cir. 2024) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Summary judgment is appropriate where the non-moving party does not make a showing sufficient to establish the existence of an element essential to its case and on which it bears the burden of proof at trial. *SodexoMAGIC*, 24 F.4th at 204 (citing *Celotex Corp.*, 477 U.S. at 322).

We "view the facts and draw reasonable inferences 'in the light most favorable to'" the Council President Heller as the party opposing Chief Vice's summary judgment motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted).

[89] ECF 50.

[90] ECF 47-1 at 8-11.

[91] ECF 50-1 at 7–10.

[92] *LeCount v. Kropp*, No. 25-1161, 2025 WL 790935, at *2 (E.D. Pa. Mar. 12, 2025) (citing *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597-99 (1989)).

[93] *Parker v. Gainey*, No. 23-2102, 2025 WL 2062563, at *8 (W.D. Pa. July 23, 2025) (citing *Lozano v. New Jersey*, 9 F.4th 239, 242 (3d Cir. 2021) ("It is equally true, though, that officers must be personally involved in a constitutional rights violation to be held liable for it.")).

[94] *Strunk v. E. Coventry Twp. Police Dep't*, 674 F. App'x 221, 225 (3d Cir. 2016).

[95] *Chavarriaga v. N.J. Dep't of Corrs.*, 806 F.3d 210, 222 (3d Cir. 2015).

[96] *Id.*; *see also Pasquale v. Borough of Mountainside,* No. 23-2752, 2025 WL 3033989, at *4 (D.N.J. Oct. 30, 2025) (explaining "(a) very close physical proximity to the underlying events, plus (b) direct interaction with supervisees during the relevant events—these can sometimes be enough to establish the sort of 'personal involvement,' . . . by a supervisor that can make him liable under [s]ection 1983 for a supervisee's actions").

[97] ECF 50-1 at 8.

[98] *Id.*

[99] *Okpor v. Williams*, No. 22-1074, 2026 WL 1079291, at *4 (E.D. Pa. Apr. 20, 2026) (quoting *Keating v. Pittston City*, 643 F. App'x 219, 222 (3d Cir. 2016)).

[100] ECF 47-1 at 19–21.

[101] *Id.* at 20–21.

[102] *Id.*

[103] ECF 50-1 at 14.

[104] *Id.* (citing *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006)). The restaurant owners in *Thomas* alleged township officials opposed their liquor-license transfer and conducted a broader campaign of harassment and intimidation. *Thomas*, 463 F.3d at 290. The restaurant owners alleged township police repeatedly entered their business without cause, falsely accused them of violating the law, increased police presence, surveilled the business and its patrons from across the street, subjected them to unlawful searches and seizures, and prompted unwarranted investigations by other agencies. *Id.* The Court of Appeals did not address whether the restaurant owners engaged in conduct warranting the police actions.

Our Court of Appeals also did not decide whether the alleged police conduct violated clearly established law. It instead directed the district court to obtain a more definite statement because qualified immunity must be assessed in the specific factual context of the case. *Id.* at 288–89.

[105] *Stringer v. Cnty. of Bucks*, 141 F.4th 76, 85 (3d Cir. 2025) (citing *George v. Rehiel*, 738 F.3d 562, 571-72 (3d Cir. 2013)).

[106] *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997).

[107] *Id.* (internal citation omitted).

[108] *Stringer*, 141 F.4th at 85 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

[109] *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

[110] *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).

[111] *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[112] *United States v. Sanders*, No. 23-7, 2024 WL 862279, at *8 (W.D. Pa. Feb. 29, 2024) (citing *United States v. Yusuf*, 461 F.3d 374, 385 (3d Cir. 2006)); *see also United States v. Nowell*, No. 22-27, 2023 WL 129738, at *7 (E.D. Pa. Jan. 6, 2023) (Our Court of Appeals "has 'held that [a]n officer can lawfully act solely on the basis of statements issued by fellow officers.'") (quoting *United States v. Williams*, 898 F.3d 323, 340 (3d Cir. 2018)); *Goldenbaum v. DeLorenzo*, No. 08-1127, 2010 WL 5139991, at *9 (D.N.J. Dec. 10, 2010) ("It is well-established that officers are entitled to reasonably rely on the information and decisions of fellow and superior officers.*").*

[113] *Thomas*, 463 F.3d at 296.

[114] ECF 47-1 at 15-19.

[115] ECF 50-1 at 10–13.

[116] *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 293–94 (3d Cir. 2018).

[117] *Id.* at 295.

[118] *Rink v. Ne. Educ. Intermediate Unit 19*, 717 F. App'x 126, 141 (3d Cir. 2017).

[119] *See Fantone v. Latini*, 780 F.3d 184, 191 (3d Cir. 2015), *as amended* (Mar. 24, 2015).

[120] *Id.*